Good afternoon. This is the time for re-hearing on bank in Maharaj v. Gonzales. We understand counsel are ready to proceed and the appellant may give his argument. May it please the Court, I'm Robert Jobe and I'm appearing today on behalf of the, on a pro bono basis, on behalf of the petitioners, the Maharaj family. Because the petitioner's brief to this Court was so poor, I find myself at the outset here having to address the issues of waiver, which is not an enviable place to begin. I have no doubt that certain issues have been waived because they weren't presented in the petitioner's opening brief, but I disagree strongly with Judge O'Scanlan's opinion that the petitioners have waived any challenge to the Board's denial of their motion to reopen. The motion to reopen that the Maharaj family filed with the Board addressed is just one issue, and that is whether conditions in Fiji have so dramatically improved or changed since 1987 when they were persecuted that the two regulatory presumptions of future persecution have been rebutted. The motion to reopen that was filed explicitly argues, and this is on page 14 of the record, that the petitioners suffered past persecution, and it specifically references the 2000 coup and the widespread violence against ethnic Indians that erupted in the aftermath of the coup. Now, in their brief to this Court, in the only brief that they filed to the panel, the petitioners dedicated almost three pages to arguing that conditions in Fiji had not changed so dramatically that it would be safe for them to return to Fiji. And in doing so, they expressly cite to their motion to reopen. This is in the argument section of the brief, and this is on page 39 of the petitioner's opening brief. They reference the 2001 State Department country report for the proposition that there's now currently violence being directed at ethnic Indians, and they cite to their motion to reopen. It's our view that because the petitioners expressly challenged the Board's finding that conditions had so dramatically changed that the presumptions of future persecution have been rebutted, and because they did so expressly by relying on the evidence that was submitted as part of their motion to reopen, and also because they specifically referenced the 2000 coup, which was the entire basis of their motion to reopen, that the issue presented in the motion to reopen has not been waived, and it's properly before the Court. Now, on that issue, before we turn to the firmer settlement question, I want to address this issue about changing country conditions very briefly, because obviously for us to prevail, we need to prevail on both questions, and if we can't win on this issue of changed country conditions, there's no need for you really to address the firmer settlement question. To rebut the presumptions of future persecution, the government must demonstrate a fundamental change in circumstance such that the petitioners no longer have a well-founded fear of persecution in Fiji. That is, that they don't even face a reasonable possibility, not even a reasonable possibility of persecution in Fiji. Now, with the motion to reopen that was filed, the petitioners submitted the 2001 State Department report, and importantly, the most important sections of that report are found, I believe, at Section 208 of the administrative record. But I need to read portions of this report, because in my mind, this clearly demonstrates that there has been no fundamental change in country conditions such that it's safe for these petitioners to return home. The 2001 State Department report says that, first, prior to the political upheaval that began in May of 2000, it said, Indo-Fijians were subjected to occasional harassment based on race. Then it goes on to say, since the takeover of Parliament on May 19th of 2000, violence against Indo-Fijians was perpetrated by ethnic Fijians. On May 19th, it says, for example, over 160 stores were looted, 30 stores were burned to the ground in Suva, most of them belonging to Indo-Fijians. The police arrested 275 persons for looting in connection with that day's activities, but on May 31st, armed protesters supporting the ethnic Fijian rebels reportedly stoned cars, beat the motorists in them, stole the vehicles. The protesters appear to be targeting Indo-Fijians in the attacks. And then the next paragraph, and this is particularly important because it specifically references Mr. Maharaj's hometown. It says that two areas near Nosori, and that's, if you look at pages 522 and 798 of the administrative record, that Maharaj's are from Nosori. It says that these areas near Nosori experienced a particularly high level of violence, including looting, arson, physical intimidation directed against Indo-Fijians. Excuse me, Counsel. Yes. I wonder if I could ask you something about firm resettlement. Of course, Your Honor. Because it actually interests me a lot here, and I don't know if we'll get to it if we discuss the change of conditions. Yes. There are a couple things that concern me. They were in Canada for several years. They had an asylum application pending. They were allowed to live and work in Canada without restriction while this process was going on. Right. And Canadian law is identical to ours. They've got the identical asylum statute, which implies that if he's entitled to asylum here, he's entitled to it there and vice versa. What that suggests to me is that there was just no burden at all on keeping their jobs and their residence and their freedom to live as free people in Canada, except what they said when they were asked, why did he come to the U.S.? Right. Well, he was, I think, a janitor. He'd been a bus driver in Fiji. He was working as a school janitor in Canada and hoped to get a better job. His wife was working in a nursing home. She'd been a school secretary and wanted a better job. Right. I don't see why we shouldn't just apply CHEO in these circumstances, all the other circuits have, and say the burden is on him to show and he didn't show that he couldn't stay in Canada. Right. I disagree with you that all the other circuits have applied CHEO in circumstances like this, but CHEO has no application to a case like this. What CHEO says, CHEO, is that where there's no evidence one way or the other. This is where there's no evidence one way or the other as to whether they have received a firm offer. Precisely. Their duration of stay implies that they could remain. Right. Exactly. That's why it doesn't apply here is because it only applies where there's no evidence one way or the other. What's the evidence that they couldn't stay in Canada? Let me just finish. Where there is no evidence one way or the other, CHEO allows you to presume, but it doesn't allow you to presume in the face of uncontradicted evidence, uncontested evidence, that you had no such offer. I mean, what I think the panel did in this case is they decided that they could presume a fact for purposes of making this decision that they knew to be untrue. Well, I think what you presumed in your answer is that the only thing that counts as an offer is a promise, okay, we're granting you asylum. I agree. I believe that's an offer. For me, the meaning of the word offer, to constitute an offer, you have to be giving me something that I can readily accept. If I can't accept it, it's not an offer. And what was offered here was the right to apply for asylum. Nobody ever offered the Maharajas asylum per se. They offered them the right to apply. But didn't they have a right to stay in Canada as long as their application was pending? And then a right to stay in Canada if it was granted? If it were granted. If it had been granted, then there would have been an offer and he would have been firmly resettled. But the point is, Your Honor, it was never granted. What he had, what he accepted, was an offer to apply. It was never denied either, right? They just abandoned it and came to the U.S. and then overstayed their visa. That's correct. And I understand your concerns because I understand, you know, the concerns and the decision that Judge O'Scanlan was referring to. And I can empathize with those about forum shopping. But the bottom line here is that for purposes of the firm resettlement regulatory provision, there needs to be an offer. And you can't simply ignore the plain language of the regulatory provision because you don't like the outcome. The way that this should be dealt with. Wait a minute. Let's look at that reg. As I remember, it doesn't say if there isn't an offer, you're not firmly resettled. It says if there is an offer, you are. Right. It says if he's received an offer, then he's considered to be firmly resettled. But it doesn't say if he hasn't received an offer, he isn't. Right. It, in fact, says the opposite. As an alternative to an offer, it says or some other type of permanent resettlement. I listened to you make that point at the panel argument. I listened to that this morning. And all I can say is no court has ever interpreted the language in that fashion. Well, at least one court has, the Tenth Circuit. This Court has consistently. The Elsor decision. Are you familiar with the Elsor decision? I'm not familiar with that decision. 2004. It says as relevant here, a third country's offer of permanent resettlement may consist of providing a defined class of aliens a process through which they are entitled to claim permanent refuge. They don't have to be at the end of the process and have in hand a ironclad asylum. They have to have a process which would lead to that. That could be a critical distinction for these people. My response to that, Your Honor, is that the Tenth Circuit is wrong. The language of the regulation is absolutely clear. I don't see how you can read the regulation in that fashion because it says — I just asked you about the language, and you said I should ignore everything after the word or because no other circuit has picked up on it. And then Judge Clifton said the Tenth Circuit has. And now you're saying just look at the plain language. But you still haven't talked about the plain language. But let's look at the plain language. An alien is considered to be firmly resettled if, prior to his arrival, he or she entered into another country with or while in that country received an offer of permanent resident status. It goes on from there. Read the words following what you just read. Or some other type of permanent resettlement. But where's the offer of permanent resettlement, Your Honor? It doesn't say that there has to be an offer of permanent resettlement. It just says that there has to be some other type of permanent resettlement. Read the words. I'm looking at the words, Your Honor, and I firmly — I strongly disagree with your interpretation of the regulation because what it says is you have to have an offer of permanent resettlement status, comma, citizenship, comma, or some other type of permanent resettlement. That means you have to have an offer of permanent resident status, an offer of citizenship, or an offer of some other type of permanent resettlement. And in this particular case, this family has never been offered any of those three things. They've been offered the opportunity to apply for asylum in Canada, and they partook of that offer until they pulled the plug on it themselves. That's right. They were offered the opportunity to apply. That's not the same, obviously, as being offered permanent resident status. Why not? Because it's just not. There's no — Well, that's not a very satisfying answer. In the context of Canada, where there does not seem to be any realistic likelihood that these people are going to be turned away, why is it that they have the option to pull the plug before the process can be completed? You know, as I was trying to explain before, it's not as if this can't be considered in the ultimate exercise of discretion. The question here is whether it means they're absolutely barred from qualifying for asylum in this country. If they're firmly resettled, which they were not because they had an offer to apply, not an offer to stay, but if they're firmly resettled, then they're barred from establishing their eligibility for asylum. They can't qualify. But what should have happened in this case, and the immigration judge, he talked about it in his decision, what he said is, there's another possibility that we can — if you're not firmly resettled, we can consider this in the ultimate exercise of discretion. And that's the way it should have been handled. The immigration judge should have said, well, I'm concerned about the possibility that you were forum shopping, you had this opportunity to apply, and I can consider that in my exercise of discretion as to whether to grant you asylum in that ultimate exercise of discretion. What would you do with a country like the United States used to be before 1924? If you want to come, you'd come. You want to go, you'd go. You want to come again, you'd come. There aren't any offers. You want to settle in the U.S.? You just get on a boat and come and settle. So there are no offers. You'd say that if somebody had come to a country with that structure of law because they did not get an offer of permanent resettlement, they just got permanent resettlement, that they would not be treated as permanently resettled in a country like the United States used to be, even if they'd been here for 50 years. I take it if the culture of the country or the law of the country is such that you are, in effect, not subject to deportation, that could be construed as an offer of resettlement. Can I just pursue your other point that addressing the problem, which I appreciate and I think we all appreciate, is that if a family is forum shopping and pulls the plug, there is apparently a structure within the asylum statutes, which is the Attorney General can take that into account and then decide in exercising discretion to address that situation without having to engraft that onto a reading of the offer language. Right. I mean, that's exactly our position. The question here is whether you're going to take away the immigration judge's discretion by extending the plain language of the statute to cover a situation like this. In our view, the immigration judge has discretion to grant asylum or deny. He's certainly required to consider the stay in Canada, but the regulations don't require that he deny the application. So if this case goes back on remand, as in our view it must, the immigration judge is going to have the opportunity to consider this four-year stay, but he's going to have to weigh that four-year stay against the fact that this family now has been in the United States for 15 years, that they've got children that have been in school here for an extended period of time, that this family applied for asylum back in 1991, 15 years ago, and it's taken this long to get an adjudication. Those are all factors that are relevant. I'm certainly not suggesting that the four-year stay in Canada and the potential for forum shopping is irrelevant. It's relevant. It's certainly something the immigration judge can and should consider, but it's not firm resettlement because it's not an offer. Counsel, we did not have the benefit of the safe third country agreement which you have just provided us in the last couple of days. As I read this material, it seems to me that if it were applicable, which it is not because of the time, that the Maharajahs would be required to be returned to Canada right now. Is that my reading of it correctly? Yes. I totally agree with you that the bilateral agreement with Canada doesn't apply to this case, but I think it does deal with the concerns that you are raising in your decision. I agree that if that But do you agree with me that if it were applicable to the Maharajahs, that they would in fact be subject to return to Canada? You know, I can't agree with you necessarily on that point because to me there's an And that is, does it apply to people who are only stopped entering at a land border? Because these individuals, they weren't stopped. They entered successfully. It seems like they were waved through even though they weren't actually entitled to enter the United States. They were not stopped at the land border and then they came and they affirmatively applied for asylum here in the interior of the country. In my reading of that agreement, it's not clear to me that it applies to them. And I was looking at the Canadian, a fact sheet on the Canadian immigration webpage about the agreement. May I ask you the question, then? Why did you bring it up to us? Why have you presented this to us? What relevance does it have to this case? I think it's relevant because it shows that the American government is dealing with the concerns that you raised in your opinion. And it seems to me what happened in your opinion is that the panel is concerned about these policy issues and they let those policy issues override the plain language of the regulation. I think that's a problem. But I think that insofar as those are concerns, and they are real concerns, the American government is dealing with them in this fashion through the bilateral agreement. But if the bilateral agreement were in effect as to them, arguably, they would be returned to Canada instead of being sent back to Fiji. Right. Arguably. Arguably. But because it does not apply to them, because the bilateral agreement does not apply, there's no guarantee that the Maharajas are going to have access to Canada and its refugee processing system once they're ordered to leave this country. It's hard to know sometimes what inferences to draw from actions that are explained only by the actions themselves. But it's at least possible to infer from entering into this bilateral agreement that the United States government and Canada perhaps also recognize that the solution under the existing regulations was different. Right. That the existing regulations operated as you're contending they do. Right. If I may just a little late say that Judge Reimer is with us by phone. I see that. Counsel, what did you do with the principle regulation that you've been discussing with Judge Clifton, Judge Feinfeld, and Judge O'Scanlan? That regulation is referred to in 208.13, which is where the phrase firmly resettled appears. And there it says that the IJ shall not grant asylum to an applicant who is      And it's referred to in 208.13. And then refers to 208.15. Now, does that mean that 208.15 is the exclusive definition of firmly resettled? That's my guess. I think it's the exclusive definition of firmly resettled. Because the term firmly resettled comes out of the regs and does not come out of the statute. Is that correct? It's not referred to in the INA any place. Well, it's not referred to in the version of the INA that applies to this case. In 19 — for applications that are filed after April 1st, 1997, the new version of the statute would apply. And that does reference firm resettlement. But for purposes of this case — Okay. So we're limited then to what the regulations tell us. Now, are the regulations exclusive? So is 208.15 the exclusive definition of firmly resettled? That is certainly our view. I think the way this has worked in practice in the immigration courts, in my experience, is that, yes, that's been treated as the exclusive definition. But then there's this other concept that we've dealt with in proceedings called safe haven. It's something that falls short of firm resettlement. And arguably, that's what we're dealing with here is we — persons that were not firmly resettled, but they found a safe haven. And generally, the way we've dealt with that in immigration court is that the finding of a safe haven that doesn't rise to the level of firm resettlement, it's not an absolute bar. It doesn't prevent absolutely an immigration judge from granting asylum. But it is a factor that the immigration judge can consider in the exercise of discretion. Now, what are the limits on that? I mean, we were debating this about, well, can firm resettlement alone constitute the basis of a discretionary denial of asylum? Well, or does that somehow violate the firm resettlement regulation? I can't answer that. And I don't think the Court has to answer that question in this case. Counsel, why shouldn't we draw an inference about what the words some other type of permanent resettlement mean from the unless clause? A, says it's not firm resettlement if he stayed in the country only as long as it was necessary to arrange onward travel and did not establish significant ties, or B, that the conditions of his residence were so substantially and consciously restricted by the authority of the country that he was not, in fact, resettled. That throws some light by negative inference on what permanent resettlement means. If your conditions of residence are not at all restricted and you stayed there for a long time, not just as long as was necessary to arrange onward travel. I'm not sure I'm following that, Your Honor. But, you know, in my view, the plain language of the word. You didn't even want to follow me to the words after the word or in the introductory paragraph. Well, because you're misreading the regulation. In my view, you don't get to these exceptions until you have an offer of either permanent residence status, citizenship, or an offer of some other type of permanent resettlement. Absent such an offer, you're not firmly resettled, and you don't need to demonstrate that you fall within one of these. Your whole argument requires that the word offer above the word or be interpreted to refer not only to the clause following the word offer of permanent residence status, but also requires the word offer to apply after the word or to some other type of permanent resettlement. Yes. Of course. Is there any case or construction that's ever held otherwise? Not that I've ever seen. I mean, that seems to be the common-sense reading of the regulation. Well, we know you haven't seen the Tenth Circuit case, but can you speak to that? The proposition put forward by the Tenth Circuit was that if you've got a process whereby you can acquire what we would call asylum status, and Kennedy uses the same vocabulary, then that's you're into the process. By being into the process, they have made you an offer of permanent resettlement sufficient for the regulation. Well, I would quarrel with that reading with respect, since it goes on to say, in contrast, a mere possibility that an alien might receive permanent refuge through a third country's asylum procedures is not enough to constitute an offer of permanent resettlement. Okay. I'll pose the question this way. Is there any realistic possibility that the petitioners were not going to be able to stay in Canada? It's impossible for me to say, because the evidence of what was before the adjudicator isn't before us. So, yes. Your client didn't express as the reason for coming to the United States anything at all related to concern about not being able to stay in Canada. That's true. I mean, we all know here, Your Honor, I mean, when you apply for asylum, even if you have a strong case, there's no guarantee that you're going to win. I mean, there's so many factors that enter it, but even here in the United States, you know, you draw an adjudicator that is predisposed toward denying cases. I mean, you have very strong cases that lose. The mere fact that you have a good case and you're in a system that's fair on its face doesn't mean you're going to win. But we're not talking about something like our court's Ali case where somebody from Somalia has escaped to Ethiopia and they're afraid of being caught by Ethiopian authorities, so after five years they come on to the United States. There's no expression whatsoever in the record of your clients having concern about their ability to stay in Canada, other than what you've just noted, there's always a chance that the adjudication will come out unfavorably. Right. But your clients did not express concern about that. I agree with that. But the bottom line is this. The regulation, the plain language of the regulation requires an offer of permanent residence, citizenship, or some other type of permanent resettlement. And they were never given such an offer. All they had was an application. They had an application pending that had never been adjudicated. If you get over the firm resettlement bar, what do we do with the case from your perspective? From my perspective, the case has to be remanded. On what issue? Well, most definitely it has to go back to the ultimate exercise of discretion. Now, it's important that you look at the immigration judge's decision because the immigration judge considered the possibility of denying this case in the ultimate exercise of discretion, but he never reached a decision on that point because he found that he had no discretion to even consider the application because the court has to go back on that. On the changed country conditions question, my own view is that the court should simply reverse. Because in my view, the evidence that was presented with the motion to reopen, and again, it hinges on this issue of waiver. But in our view, the evidence that was presented with the motion to reopen is so compelling that no reasonable person could. Well, you know, under our case law, when there's a claim of changed country conditions, it has to be a specialized, focused determination on the circumstances of the alien. And the board didn't seem to do that here. So why wouldn't we send it just – if you get on the firm resettlement part, why don't we just send it back to the board to do that? I agree with your point that there was no individualized analysis. If that were the outcome, we'd find that quite acceptable. Mr. Joe, why even on the firm resettlement issue shouldn't we do a Ventura remand? Because at least so far as I know, the BIA hasn't addressed the issue of firm resettlement since 1989 in Soleimani, or however you pronounce it, and certainly has not construed the regulations that are applicable in this case. I don't think Ventura requires a remand on that issue, Your Honor, because the board decided that question. The board issued a pro bono affirmance essentially adopting the immigration judge's reasoning. Oh, the immigration judge's reasoning is incomprehensible. Yeah. Maybe. Well, it is, because he says there was an offer that he says, but they left before there was an offer. Yeah. But you can't make heads or tails of what he was deciding. So why wouldn't you – because we give Chevron deference to the agency's own regulations. Why wouldn't we just send the whole thing back for a new look under these regulations? Yeah. I certainly don't think Ventura requires a remand on those grounds because Ventura applies where the agency's never had an opportunity to address the question. Here the agency addressed the question, made a ruling that there's a firm resettlement issue here, found these applicants to be firmly resettled. It's purely a question of law at this point. The facts are undisputed. The government can recognize that these individuals left Canada when their applications were pending. There's no factual dispute about that. It's purely a question of applying the plain language of the regulation to the undisputed facts of this case. I don't see any reason to remand it when the board and the immigration judge both had an opportunity to rule on that question. Counsel, are you arguing for us to overrule CHEO or you simply say it doesn't apply? I think it simply doesn't apply. I actually don't have any – So you don't have any quarrel with CHEO? No. I'll reserve the balance of my time. Thank you. Pardon me. Chief Judge Schroeder, Your Honors, may it please the Court. I agree with the Elsa decision in that I believe that under the plain language of this regulation, a formal asylum application process and a pending application with all of the benefits that go with that, as was evident in this case, the ability to work, the ability to go to school, to have free education, to have free vocation training, to have jobs. In fact, this family had a child born as a Canadian citizen's son, to have a child, to have insurance paid for that. I think that that certainly can be construed under the regulation as some form of permanent resettlement. But the panel opinion specifically assumed and stated that we know that the Maharaj family's asylum claim was still pending when it chose to leave Canada, and so we have direct evidence that the members of the family never actually received an offer of permanent resettlement. Do you think was the panel wrong in that regard? I think that the board hasn't had the panel. No, I don't think that the panel was wrong necessarily. I think that this is an issue that has never yet been decided by the board, and I disagree with my colleague in that the fact that it's a pure question of law does not take it out of the board's hands. In fact, the board should have the first opportunity to interpret a question of law like that. Well, they've not decided in a published opinion. They've obviously just – I'm over here. Judge Fletcher. Divorces. They've decided it in this case. You might want an authoritative opinion out of the BIA, but Ventura requires an opportunity for them to decide, which they've had. Now, we may for various reasons remand sometimes an excretion and so on, but I don't think we're required under Ventura to do it. Do you disagree with me on that point? Well, I disagree with you that they decided it in this case. I don't – I think that – What did the I.J. do? I think the I.J. applied CHEO in this case. That's what I think the I.J. did. So the I.J. did address resettlement. Did the I.J. address resettlement? Yes. I think the I.J. absolutely addressed it. Yeah. Well, then I don't see what – why there's a required remand under Ventura. Because under CHEO, or at least under all of the cases, and it brings me back to a point that I want to make about CHEO, I think that – I think it was Judge Kleinfeld. I think that you're absolutely correct. Most of the courts that have addressed the question of firm resettlement have accepted some sort of a CHEO type of analysis. The problem with this situation is that there are two prongs under that analysis. You look at whether there was an offer of either permanent residence or an offer of permanent resettlement. If there's no evidence either way, you have a second step. And what the immigration judge did in this case is – Is it a second step, or is it merely evidence indirectly suggesting that there's been an offer? Well, I'm saying it's a second step, but you're correct, Your Honor. It's a different evidence. But here's – there's no dispute that there's not an offer, right? I mean, CHEO is different because there's just no evidence one way or another. Here we know that there's not been an offer. That's undisputed, isn't it? Well, actually, no, we don't know that because – Well, what do you know from this record? Well, what we know from this record is that Mr. Maharaj was asked at his hearing about his situation in Canada, and he said that I applied for asylum. He said, I don't know what happened. I think it was pending when I left, but I don't know what happened. And what – the confusion that my colleague pointed to, the judge was trying to decide what to do with that and came to the conclusion that he couldn't say that it had been denied. He couldn't say that the application had been accepted. If he says, no, was your application processed to completion, no, they're still pending. What's ambiguous about that? Well, he's asked on several different occasions, and he then says, I don't know what happened to it. And his – and his hearing is several years after he left. His hearing is in 1998, I think, and his application process was in 1991. So he is not at all clear. He doesn't say – he says at one point it was pending, and then he says, I don't know what happened to it. So – But what do we do with a – over here again. I'm still in the same place. I'm confused by the telephone. Okay. By a fact that the BIA was apparently unwilling to take into account but appears, if you believe it, quite clearly to say, yes, we do know what happened. He was denied. No. What the – what the BIA did was there was a – the procedural – the procedure in this case is a little bit difficult to follow, but there was an appeal. There was a pro se appeal by Mr. Maharaj from the IJ's decision of primary settlement. After that appeal was pending, he hired a lawyer who came in and filed a second notice of appeal. After that second notice of appeal was filed, Mr. Maharaj himself went in and filed a motion to supplement. And it was part of that motion to supplement that he included just this facts cover sheet with his motion. And what the board said was that we're not going to accept this. We're not going to accept this facts cover sheet. So, in fact, there is no evidence in this record that it had been denied. Right. But I find it a little artificial. But I find it a little artificial for us to pretend that that piece of paper doesn't exist. I understand it may not be in the record, but I don't really feel comfortable speculating, well, he might have been admitted, when we know, in fact, he might not have been admitted. I mean, at a minimum, we have to say we don't know. That's exactly correct. We don't know. But we do know that he had an application. That's exactly right. And that's what the IJ did in this case. The IJ said, we don't know. Let me read to you the Chao case. Let me read to you. What does the word offer mean? I'm thinking it can't mean what it would mean in a contract case where you'd have to get a letter or a phone call or a ruling directed to you saying, we offer you permanent resettlement, because that wouldn't make comprehensible your situation in a country where you didn't need any personal offer, you just had a right to stay. Like the U.S. used to be, and there may be many other countries. I don't know. I don't like that. I agree. And that's the problem with the Petitioner's definition of that and his reading of this regulation. What does offer mean? In all but a very few countries, when there are many places in the world where somebody could resettle and would have, you know, safe resettlement, but they wouldn't necessarily get a firm offer in the sense that an authority figure would come in and say, here's your offer. Why wouldn't the Chao presumption take care of those cases, though, where there's nothing contrary, where the evidence is that this is a country that doesn't have that kind of process and you've lived there for 20 years, and why doesn't the presumption take care of those cases without? I think it does. And I think that that's a fair reading. I think that that's a fair reading of the regulation. I think that Chao correctly reads the regulation and applies it. And I think that the immigration judge in this instance correctly read Chao and correctly applied it to this instance. Let me tell you just from my part what my difficulty is a little bit with your position. If someone is fleeing from a country where, as in this situation, the government concedes there was past persecution, and let's say that person looks around the world and says there are 25 countries I could go to, and I pick the United States, and they came here right away, so there is no firm resettlement question. It doesn't matter that they had other opportunities elsewhere if they came here first. That's not a basis under our law to send them to just some random third country. And so my question to you is, why shouldn't we read this regulation literally to say that this intervening period of time, unless you either have ‑‑ if there's evidence that you've tried in the other country but no evidence that you've succeeded, why shouldn't we read the resettlement regulation to allow that to continue to go forward? Because I think you have to look back at the policy considerations that the Supreme Court took into account in Wu, which is that what you're doing is you're taking a person who has found at least for a period of time, at least in this case, there was temporary resettlement. I mean, they had all the indicia of temporary warrants. But the regulation says permanent resettlement, and it's not our regulation. I understand that. But this Court, if you're going to overrule CHAO, that is a different situation. But CHAO says that if there's no evidence either way, either that there was an offer of permanent resettlement or that there was not. And I think that you can read this situation perfectly into that. But the panel didn't. What the panel says, there was no offer. They made that finding. Now, that's ‑‑ isn't that one of the problems here? Why can't, as suggested, if there is an offer, or rather there is no offer, it's a situation where it appears that everything is going swimmingly for the applicant, but there's no official grant of permanent resettlement, and there's always the possibility that they won't get it. Why can't the Attorney General take into account the Wu concerns by deciding not to exercise discretion in favor of granting asylum? Why isn't that the policy regime? That's why the Attorney General is given the discretion, isn't it? That's correct. But the problem is that the regulation is a bar. It's an absolute bar. It's not a question of ‑‑ That's right. And shouldn't we read it narrowly? I think you can, but you have a regulation here that interprets it, and you may read it narrowly. You can read a statute narrowly, but this is an interpretation. Rather, this is a regulation that is implementing a policy. And uses the word offer. And you want to expand offer to say an offer of permanent resettlement is an offer of a process. It may or may not lead to permanent resettlement. No. What I said was that I agree with the Elsor decision in that it could. If the court does not accept that position ‑‑ Can I read to you? I want to read to you, Elsor, that you say you're accepting. This is Elsor's definition of an offer of permanent resettlement, and I'm simply reading from ‑‑ Oh, it's one of these darn reprinted things. It's the third full paragraph up from Roman 3. As relevant here, a third country's offer of permanent resettlement may consist of providing an offendant class of aliens a process through which they are entitled to claim permanent refuge. If an alien who is entitled to permanent refuge in another country turns his or her back on that country's offer, that doesn't say if they have a possibility. They say if they are entitled to a permanent ‑‑ He didn't know he was entitled. He'd applied. But he didn't know he was entitled. He said he was. He hoped he was. Exactly. Your Honor, exactly. And that's why I think that the panel decision in this case and the board decision in this case is consistent with Chao. Because the problem was, and I disagree with the reading of the panel that says there was evidence ‑‑ There was evidence that there was no offer. That's what they said. That's what they said. I just read from the panel opinion. I wasn't making it up. No. It said we have direct evidence that the members never actually received an offer. Yeah. That's what I read. Let me ask a question a different way. That's hardly a finding, is it, counsel? Thank you. Last I heard, the panels of this Court do not make findings in fact. Yes, we do. I can cite some cases. Even so, I mean, that's taking ‑‑ if you take that one sentence, when you look at what the panel did in this case and you look at the decision that they were reviewing, I think that it's very clear that what was at issue here was whether this case fit into Chao. And when you look at the record in this case, the panel was correct. There was no evidence that they had an offer. There was no evidence that they didn't have an offer out of Mr. Maharaj's very testimony. He said he didn't know what happened to his application. At that point, the immigration judge didn't know that it had not been granted. He said it was pending. He said it was pending. That's what he says in the record. I hate to disagree with you on that. And maybe you can point to someplace else. Let me ask a different question. We can look at the record later and settle it. Right, right. Do you think that they have been firmly resettled in the United States because they have an application pending here? Should Canada conclude that in the 15 years they've been in the United States, they are firmly resettled because they are they have an application pending that hasn't received a final decision yet? Your Honor, you know, I think that under the facts of this case, that this is getting a little bit off track, because in fact, I mean, if I agree with the Court that a pending application is not an offer, and I really think that in the terms of this record and of this decision, that it's not relevant, with all due respect, because the panel applied the Chao presumption. The panel found no evidence either way that there was not an offer. I want to pursue Judge Thomas' question a little further, because I think you're not coming to grips with the issue that is of concern to some members of this Court, and that is we regularly see cases where a person is being deported after being here for 4, 8, 15, 20 years, and Canada presumably would have that same right as would any other country. And so if we read the literal terms of the regulation, why would we consider a pending but unresolved application to be the kind of offer of permanent resettlement that is contemplated there? I mean, the idea is if you're going to get asylum somewhere else, you can't just come here anyway. But doesn't the regulation require that? When realistically, I think the time doesn't have that in this case. I'm not asking the Court to do that in this case. What I'm asking the Court to look at is the panel decision in this case and the board decision, in which there is no evidence either way that they did not have an offer or that they did have an offer, and therefore the panel correctly applied CHEO and looked at all of the other indicia. I think that if the Court needs to, and it was a little bit difficult in terms of this case to understand what the Court was looking for, because the petition for en banc in this case did not address that and did not ask for that. So it was a little difficult, and there was no supplemental briefing in this case to address any particular question. So where does ELSOR fit in at that point? I'm sorry, Your Honor. Where does ELSOR fit in that analysis? As I look at it, we had a fact established that, indeed, there was a request, but it was denied. Is that a significant difference? I'm sorry. Say again. As I understand it, the request for asylum in Canada in ELSOR, the Tenth Circuit case, was denied. Was denied. And that was a matter of record in that proceeding. Right. Okay. Well, that's the problem in this case. This record does not have. I mean, Mr. Maharaj did not petition for review of the Board's decision on his motion to supplement. He just dropped it. In fact, in his brief to this Court, he goes back and says that the application is still pending. So, frankly, it's very, very difficult on this record to really determine what went on. Well, if it matters whether it is pending, successful or unsuccessful in Canada, then would we have the opportunity to remand it for that kind of finding, to find out what matters? In other words, if legally under the regulation it matters whether that application is still pending or whether it's been denied or whether it's been granted and they could actually firmly, permanently return to Canada, would we have any way to do that, to find that out? I think so, Your Honor, because I think what you're doing, what you are doing in this case is reviewing what the Board did on the facts that the Board had before it. And what the Board had before it was no evidence either way that they had an offer or not an offer. At least that's what the Board found. Gosh, I have to say, I'm looking at this thing and it says, he says it in four different places that he had a pending application that had not been granted. Well, Your Honor, I don't think it strengthens our position that what this Court needs to decide and that the panel properly applied the Chao presumption in this case, but the Court does not. And the Board has never addressed the issue of whether a pending application, you know, has that type of presumptive value. Let me address your argument with a hypothetical case, not this case. I'm trying to understand this. Let's say somebody flees a country where they have been persecuted, as these people did, and they go to Canada, as these people did, and they file an asylum application under asylum law identical to the U.S. law. These countries use a U.N. convention to write their asylum laws. That's why they're identical, as these people did. But now let's change it and make it hypothetical. Let's say after five or ten years in Canada where they had been free to work and reside without restriction, Canada denied their asylum application. Would they be entitled to come to the U.S. as tourists, just come across at Niagara Falls as tourists, overstay their visa, apply for asylum, and have the whole process run again without — only with regard to well-founded fear and without regard to whether they had been permanently resettled in Canada? I think that's a question, Your Honor, and I suggest that perhaps not, because in 208, which is 8 U.S.C. Section 1158, one of the things that makes somebody ineligible for asylum is the fact that he has had an asylum application denied. It doesn't say a U.S. asylum application. It says an asylum application denied. Now, I have to confess, I mean, I look to see how that's interpreted. Well, clearly that has to refer to a denial by this country. Well, I think clearly Congress could have said — Congress could have said a lot of things to make a lot of things clear. Right, so I think it certainly can be interpreted, given the policy behind, as the Supreme Court said in Wu, is to have the world community join in this process of resettling and accepting people who are fleeing from persecution. I certainly think so. So if another country is derelict in its duty to do that, you're saying we shouldn't do it either? I mean, that's really your answer. Well, you said that there was a general recognition that nations ought to give asylum to someone who's persecuted and in danger in their country of origin. And if a person is in that situation, as these folks are, where there's a government conception of past persecution, if another country were to deny them asylum in spite of the persecution they suffered, I understand your position to be that they didn't get asylum there. I think it would have to — I think it would have to depend on the grounds, Your Honor, because, in fact, we could — the government in this case conceded past persecution, but we denied them asylum because there's no well-founded fear of future persecution. So I think that to make a broad statement about what or wouldn't happen, I think, really depends on the situation. Well, let's take another hypothetical. Let's return to mine and get an answer, which is, you know, Canada is a signatory to the refugee treaty that's established from which this whole law has emerged. Do you think that they're firmly resettled in the United States because they have an asylum application pending here of which — on which a final decision hasn't been made? They've lived here 15 years. My answer to that, Your Honor, is that the board has not addressed that issue yet. And that is because it's the board's duty to, in the first instance, to interpret the regulations and interpret the statute. It's the board's position to do that. There is no case that I know of other than ELSOR. There's no other case. And there is no published board case. The board has not even addressed, as far as I know, in a published decision, the regulations barring asylum. This is Judge Reimer, and I'm up here on the ceiling. Here's my question. I don't understand what the pendency of an application has to do with the regulations. It may have to do with the exercise of the Attorney General's discretion. I'm just going to propose a construct to you for the purpose of your telling me whether you agree or disagree with it. The regulation plainly turns on whether there is an offer of a permanent residence in the country. So the government should have to offer some evidence showing that. If it cannot do so directly, it could do so through a surrogate, which would, in effect, be like the Chowell presumption, showing some kind of governmental recognition of permanence, such as the issuance of a travel document, a permanent-type residence permit, or something like a Social Security card, which is only given to people who have a right to stay in the country forever. And if it does, then the burden shifts to the alien to show that one of the two presumptions applies. That's correct, Your Honor. I'm not exactly sure what is your question. My question is, do you agree with that construct? Because if you do, I'm surprised. What I'm trying to say to this Court is that I think that the question of whether you agree with that construct or not. It's for you to restate the question, Your Honor. All right. Our government should have to show that the third country issued to the alien an offer of some type of official status permitting the alien to reside in that country on a permanent basis. It can do so by direct evidence of a formal offer. In default of that, if the government were to show that direct evidence is not obtainable, then it could make an indirect showing similar to the evidence that Chao relied on, only the evidence couldn't be just longevity or just availability of benefits, but it would have to show that the third country government had conferred a status of some sort that would show the right to return, like a passport, or the right to work forever, like a Social Security card. If that showing were made by the government, then the burden would shift to the alien to show that one of the two exceptions in the regulation applies. Well, I think that that swallows the Chao presumption. Because if, in fact, you could show that another third country gave him a passport and he has the right to come in and out of that country, you know, at will, then, in fact,  Permanently. Then, in fact, you have evidence of either an offer of permanent residence or permanent resettlement. And, in fact, in this case, what we didn't have. That's what the regulation requires. That's exactly right. But this court has looked at that and said, when there is no evidence either way, and that's what happened. And so we're sitting in bank, okay? No, I understand that. I do. And I am The way that the Chao presumption plays out is on the table. Yes. And I am urging that that is the proper wording of the regulation, in case I didn't make that clear. Do you disagree with Judge Reimer's? I guess I'm not really sure I understand your question. Do you agree or disagree with Judge Reimer's construct? And if you disagree, I'd like to know in what particular it was incorrect in your opinion. I disagree in that I don't think that there's any that there's room for any other type of situation other than a country that has a very formal process of giving people passports and or some sort of formal permanent residence situation, and that would limit the number of countries in which you could find firm resettlement, when, in fact, there are many places in the world where an applicant, you know, where a refugee can go and can It has all the indicia of resettlement and yet will not have necessarily a passport or formal documents. Counsel, let me ask you something about the source of this. The source of our statute is the United Nations Convention, and all the signatories adopt identical language in their statutes. I wonder if you could tell me what the interpretations of the U.N. Convention have been and what there is to help us interpret the convention for a question of, say, whether, well, say the Maharajas were disappointed in the way America had worked out and now went to Ireland because it has a hotter economy. Are they entitled to continue to pick and choose places of resettlement until somebody grants or denies asylum? I can't speak intelligently as to that question worldwide. I think that certainly the bilateral agreement between Canada and the United States has addressed that and wants to avoid that type of situation, which is what Wu talked about, is that taking up the very limited number of spaces What I'm asking about is basically a Wu question. I had understood the U.N. Convention to mean once you land where you can stay without restriction and work without restriction, that's where you have to seek your asylum. I think that's correct. And not that you can continue to move around. I think that's correct. And I think that our policy speaks to that as well. Your response to Judge Graber's request that you clarify your response to Judge Reimer's question, your response was, well, there are going to be lots of countries that won't have a sort of formalized process. But I think the regulation takes care of that by the language that Judge Kleinfeld has been concerned about or some other type of permanent resettlement. But here, of course, that's not the problem. We have a country that has very precise offers, very similar to ours, so it comes easily within the first couple of clauses and you don't need to get to the other. It does, but we don't know what happened. And so what would happen is that if you allow somebody like the Maharajahs to leave while their application was pending, it puts them into a situation where they can apply and keep moving around. That's a very good question. Attorney General, why can't the Attorney General cut that off by denying asylum to those kinds of people? That's the backup. Any exercise of discretion? I believe that there has been precedent for the position that firm resettlement is, you have to look, if you find firm resettlement, it is a bar. It does not go to discretion. Okay. And if you don't have it, but they're forum shopping, it's not a bar, so the Attorney General has the discretion to factor that into a denial of asylum. Correct. Okay. Your time has expired. Thank you. Just very briefly, I'm surprised to hear that the government doesn't know what happened to the application that was filed in Canada because at the close of the evidentiary hearing, the government trial attorney in this case asked for a continuance in order to contact the Canadian authorities and ask them the status of the application. The judge granted that request. And the judge asked, well, why do you think you're going to get that information? And she said that we've done it before and we've gotten the information. And she came back at the next hearing and she said, quote, this is on page 608 of the record, I did contact Canadian Immigration and it appears that these respondents did in fact apply for asylum through Canadian Immigration. And they just didn't follow through. They were not scheduled for an interview until the time they left Canada. They really absconded from Canada in 1991, she says. Subsequently, after their departure, the trial attorney says they were scheduled for an interview and they never showed up. So Canadian Immigration just kind of closed out their cases. This is a concession by the government on the record in the hearing. There's no dispute about what happened with the application in Canada. The government closed it out after they departed the United States. That's not an offer of firm resettlement. Any other questions? Thank you, counsel. The case just argued is submitted for decision. That concludes today's calendar for today. The court stands adjourned.
judges: Schroeder, Pregerson, O'scannlain, Rymer, Kleinfeld, Thomas, Graber, W Fletcher, Fisher, Gould, Paez, Rawlinson, Clifton, Bybee, Callahan